United States District Court

For the Northern District of California

1
2
3
4
5
6
7          IN THE UNITED STATES DISTRICT COURT

8        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   SALIMA ABDULLAH,                          No. C-09-02909 MMC

11              Plaintiff,

12      v.                                     **ORDER GRANTING PLAINTIFF'S
                                               MOTION FOR JUDGMENT; DENYING**
13   ACCENTCARE LONG TERM                      **DEFENDANT'S CROSS-MOTION FOR**
     DISABILITY PLAN,                          **JUDGMENT**
14
                Defendant.
15   _____/

16   METROPOLITAN LIFE
17   INSURANCE COMPANY,

                 Real Party In Interest.
18   _____/

19

20          Before the Court are cross-motions for judgment, filed, respectively, by plaintiff

21   Salima Abdullah ("Abdullah") and defendant AccentCare Long Term Disability Plan

22   ("AccentCare"), each brought pursuant to Rule 52 of the Federal Rules of Civil Procedure.

23   Having considered the parties' submissions filed in support of and in opposition to their

24   respective motions, the Court rules as follows.

25                                    **BACKGROUND**

26          Abdullah seeks relief under the Employee Retirement Income Security Act

27   ("ERISA"), 29 U.S.C. § 1001, et seq., claiming AccentCare abused its discretion when it

28   denied her claim for disability benefits.

I.      **AccentCare's Disability Plan**

At all relevant times, Abdullah was a registered nurse employed by AccentCare, and was covered by their long-term disability plan ("the Plan"). (See Administrative Record ("AR") 0156.)[1] Metropolitan Life ("MetLife") both funds and administers the Plan. (See Def.'s Opp. and Cross-Mot., filed April 23, 2010, at 2:1-13.) The Plan provides benefits for policyholders who are "Disabled," defined therein as follows:

[D]ue to Sickness or as a direct result of accidental injury:

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and

- You are unable to earn:

    - during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and

    - after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

For purposes of determining whether a Disability is the direct result of an accidental injury, the Disability must have occurred within 90 days of the accidental injury and resulted from such injury independent of other causes.

(AR 0023.) The plan further provides: "Sickness means illness, disease or pregnancy, including complications of pregnancy." (AR 0026.)

II.     **Abdullah's Medical History**

On May 8, 2007, Abdullah filed a claim for long-term disability benefits under the Plan (see AR 0156), stating that as of May 7, 2007, she was unable to work (see Pl.'s Mot. for Judgment, filed March 26, 2010, at 6:2-3), and describing her condition as "[fi]bromyalgia w[ith] multiple auto-immune diseases result[ing] in chronic fatigue, poor focus [and] chronic widespread rheumatoid symptoms [and] pain all over, all the time" (AR 0828). As discussed below, Abdullah, for a number of years prior to the date of her claim,

---

[1] The Administrative Record was submitted as an exhibit to the Declaration of Laurence F. Padway, filed March 26, 2010 in support of Abdullah's motion for judgment.

1   had been seen and treated by various medical practitioners for complaints of ongoing pain

2   and fatigue.

3          In 2002, Eleanor Hynote, M.D. ("Dr. Hynote"), a board certified internist, diagnosed

4   Abdullah with fibromyalgia.  (See AR 0610.) At that visit, Abdullah "complain[ed] of

5   increased 'brain fog' with difficulty focusing on work, especially with the required

6   paperwork."  (AR 0609.)  Abdullah also reported "increasing fatigue" and "increased

7   headaches and myalgias," along with "chronic vaginal burning and recurrent bacterial

8   vaginitis" and "muscle spasms."  (Id.)

9          In July, 2004, Abdullah was referred to Zuzana Foster, M.D. ("Dr. Foster"), a board

10  certified rheumatologist, for an "evaluation of positive ANA [antinuclear antibody],[2] positive

11  rheumatoid factor, and positive SS-A [Sjogren's syndrome antibody]. . . ." (See AR 0300.)

12  Dr. Foster reported that Abdullah's tests "revealed a positive ANA . . . , a positive

13  rheumatoid factor . . . , as well as a positive SS-A antibody " (Id.)  Additionally, Dr. Foster

14  noted Abdullah had "generalized pain" and "approximately 6 to 8 out of 18 fibromyalgia

15  tender points," and also a "bilateral bony enlargement of both first MTP

16  [metatarsophalangeal] joints, worse on the left than on the right."  (AR 0301.)  Dr. Foster

17  also noted "muscle spasm" in Abdullah's left trapezius muscle and gave her an injection for

18  "myofascial pain" in that area.  (Id.)  In Dr. Foster's opinion, Abdullah's "abnormal

19  serologies suggest[ed] predisposition to autoimmune disorder," she was "at risk for

20  developing a connective tissue disorder," and she manifested symptoms that "may indicate

21  early Sjögren's syndrome."[3]  (See id.)

22         In October, 2005, Abdullah met with Marilee Schuchard, M.D. ("Dr. Schuchard"), a

23  pain specialist, at which time Abdullah complained of pain "located in [her] neck, bilateral

24  shoulders, rhomboid, mid back, low back and buttock," and "describe[d] the pain as

25

26         [2] According to Abdullah, an ANA test "helps screen for autoimmune disorders."  (See
       Pl.'s Mot. for Judgment at 4, n.2.)  MetLife does not dispute this description.

27         [3] Abdullah describes Sjögren's syndrome as "a systemic and sometimes debilitating
28  disease which is known to produce extreme fatigue and joint pain."  (See Pl.'s Mot. for
    Judgment at 3:7-8.)  MetLife does not dispute this description.

constant, throbbing, tingling, squeezing and pins and needles." (AR 0213.)  Abdullah

further reported she was "taking Vicodin . . . four times a day" and had "tried acupuncture,

chiropractic care, physical therapy . . . and seen a psychologist." (Id.)  Dr. Schuchard

reviewed Abdullah's laboratory test results from September 2005, which showed her "ANA

[was] high at 7.5." (AR 0215.)  The results further showed her "Sjögren's antibody [was]

high at 32" and her "[r]heumatoid factor [was] positive." (AR 0214.)  Dr. Schuchard's

"assessment" was "non-specific connective tissue disorder" and "secondary fibromyalgia

with triad of insomnia, depression and muscle pain." (AR 0215.)

On March 16, 2006, Abdullah had an "initial rheumatology consultation for

fibromyalgia" with Margaret Li, M.D. ("Dr. Li"), a rheumatologist.  (See AR 0243.)  In her

notes, Dr. Li recorded that Abdullah had recently participated in an "[inpatient] holistic

medicine program" and had "stopped work for 3 months[.]" (AR 0244.)  Abdullah reportedly

felt as though the program helped considerably, but that upon her return home, her pain

returned, albeit "to a lesser degree." (See id.)  Abdullah stated she was "ready to go back

[to work] full time"; she continued to complain, however, of "pains in [her] neck and low

back" as well as "pain in [her] fingers and wrists" and had "multiple tender points of neck,

back, elbows, knees and ankles." (See id.)

On October 19, 2006, Abdullah was "rear-ended" on a freeway while stopped in

traffic, and, later that same date, saw John Turns, M.D. ("Dr. Turns"), who diagnosed a

"cervical strain." (See AR 0630.)  At that time, Abdullah reported experiencing "slight

fogginess" and was advised not to return to work until October 24, 2006.  (See id.)

Thereafter, on October 23, 2006, Abdullah had a follow-up visit with Katherine McLean

("McLean"), a certified physician assistant, at which time Abdullah reported "having muscle

spasms in the upper right back and shoulder." (AR 0633.)  McLean recommended

Abdullah take the rest of the week off and take medication as needed.  (See id.)  On

November 2, 2006, when Abdullah returned to McLean for a further follow-up visit, she

reported "feeling worse" and complained of "having worsening pain in her neck muscles,

spasms, and worsening pain in her back." (See AR 0634.)  McLean recommended she

4

"continue off duty status."  (Id.)

On November 8, 2006, Abdullah saw Douglas Abeles, M.D. ("Dr. Abeles"), an orthopedic and reconstructive surgeon.  (See AR 0673.)  Dr. Abeles reviewed Abdullah's x-rays, which showed her "cervical spine ha[d] degenerative changes from C3-C7 with collapse at multiple levels," as well as "mild arthritic changes throughout the lumbar spine with collapse at the L5-L1 level." (AR 0675.)  Dr. Abeles diagnosed scoliosis, degenerative disk of the lumbar spine, degenerative disk of the cervical spine, cervical sprain/strain, and lumbosacral sprain/strain.  (See id.)

On February 5, 2007, Dr. Abeles saw Abdullah for a follow-up evaluation, at which time Abdullah stated she was "continu[ing] to experience severe pain in her neck and low back" and had "intermittent numbness and tingling in her index and ring fingers in her right hand" following the October 2006 accident.  (See AR 0677.)  Due to her increased pain and resulting "significant difficulty" at work, Dr. Abeles took Abdullah off work on a temporary basis.  (AR 0678.)  On February 20, 2007, Dr. Abeles saw Abdullah again, told her to remain off work for an additional two weeks, and recommended she begin physical therapy. (AR 0680.)  Abdullah thereafter received physical therapy, from which, in Dr. Abeles' opinion, she "ha[d] benefitted." (AR 0682.)  Dr. Abeles further noted that Abdullah had been paying "for acupuncture and massage out of her own pocket."  (See id.)  On March 6, 2007, Dr. Abeles recommended Abdullah "return to modified duty of a limited four-hour work day" (AR 0683) and, on April 12, 2007, Dr. Abeles noted that Abdullah "ha[d] made significant improvement" and could "return to full [work] duty without restrictions as of 4/16/07."  (AR 0687.)

On April 18, 2007, Abdullah was in another automobile accident, following which she was transported by ambulance to Kaiser Foundation Hospital for treatment.  (See AR 0449.)  At the hospital, Abdullah reported experiencing "slight neck pain," but "no distress [was] noted" by the attending nurse.  (See id.)

On May 7, 2007, Abdullah had her first appointment with Milton Chan, D.O. ("Dr. Chan"), an osteopathic physician, for a follow-up visit after the April accident.  (See AR

0519.)  At that appointment, Abdullah, as noted by Dr. Chan, complained of "low mood,
crying, anxiety, anhedonia,[4] [and] insomnia since having [a] recent MVA [motor vehicle
accident]"; as further noted by Dr. Chan, Abdullah had a history of fibromyalgia,
undifferentiated connective tissue disease, and chronic neck pain.  (See id.)  As diagnoses,
Dr. Chan listed depression, fibromyalgia, and chronic neck pain. (See id.)

On May 8, 2007, Abdullah was seen at the triage unit at Kaiser Permanente
Hospital.  (See AR 0370.)  The notes of that visit list "[d]epression related to life stressors"
and note that the "most recent episode, related to [a] car accident, happened a few weeks
ago." (See id.)  Abdullah requested medication for depression, reporting that she felt a
"lack of motivation . . . hopeless, down, tearful, [and had] problems concentrating, making
decisions, loss of energy, fatigue . . . . [and couldn't] seem to calm down to do anything."
(See id.)

On June 5, 2007, at a physical therapy session, Abdullah reported pain levels of  "6
[out of] 10 at rest" with headaches at an "intermittent 8 [out of] 10"; she described her upper
trapezius pain as "dull, constant 8 [out of] 10 worst, current 6 [out of] 10."  (AR 0238.)
Abdullah also complained of "dizziness, confusion, difficulty concentrating" with some "R/L
[right and left] hand numbness."  (Id.)

On July 3, 2007, Abdullah met with Jeffrey Karlin, D.P.M. ("Dr. Karlin"), a podiatrist,
for a pre-surgical consultation concerning a bunionectomy to correct what Dr. Karlin
described as "severe degenerative joint disease" of her first metatarsophalangeal joint.
(See AR 0455.)  On July 10, 2007, Dr. Karlin performed a bilateral Keller bunionectomy.
(See AR 0459.)  Abdullah was "very happy with the results."  (See AR 0462.)

On August 21, 2007, Abdullah met with Jennifer Gunter, M.D.("Dr. Gunter")[5]  to

---

[4] According to Abdullah, "anhedonia" is the "[l]oss of capacity to experience
pleasure."  (Pl.'s Mot. for Judgment at 6, n.3.)  MetLife does not dispute this description.

[5] Dr. Gunter is a Fellow of the American College of Obstetricians and Gynecologists
and a Diplomate of the American Board of Pain Medicine, as well as a Fellow of the Royal
College of Physicians and Surgeons of Canada.  (See AR 0258.)

1   evaluate her "chronic vulvar pain."  (See AR 0258.)  Dr. Gunter diagnosed vulvadynia,[6] and

2   referred Abdullah for pelvic floor physical therapy. See id.  The physical therapist thereafter

3   rated Abdullah's "rehabilitation potential" as "fair."  (See AR 0259.)

4       On September 13, 2007, Abdullah was seen by Dr. Chan for a follow-up evaluation

5   of her pain.  Abdullah reported she was taking "4-6 norco's per day,"[7] was "unable to

6   function," and even with the medication, still had, according to Dr. Chan's notes, "significant

7   pain."  (See AR 0253.)

8       On October 9, 2007, Abdullah had a physical therapy evaluation at Kaiser

9   Permanente and was deemed appropriate for a "Chronic Pain" program.  Abdullah was off

10  work at the time and, although she reported "no impairment" as to various daily activities

11  (see AR 241), stated she did "not see a return to home health work."  (See AR 0240.)

12  Under "Chief [C]omplaints" the therapist listed  "[b]ilateral neck/shoulder pain," at a level of

13  "6 [out of] 10 most of the time . . . . [with] [f]lareups up to 10 [out of] 10," "[b]ilateral low back

14  pain" at a level of "8 [out of] 10," and "[h]eadaches, fatigue, [and] dizziness (with looking

15  up)."  (Id.)

16      Abdullah thereafter attended Kaiser's Chronic Pain Level 2 program.  At a December

17  5, 2007 session, on a "Pain Inventory," Abdullah rated her "worst pain" at a level 8, her

18  "least pain" at a level 3, and her "average pain" at a level 5.  (AR 0554.)  She rated pain as

19  "interfer[ing]" with her work at a level 7.  (See id.)

20       On July 3, 2007, Abdullah had an appointment with Dr. Chan.  Abdullah reported

21  experiencing "[w]orsening anxiety and depression due to [the] fact she [would] lose her

22  insurance . . . and not have an income."  (See AR 0254.)  On a checklist, she responded

23  "nearly every day" as to "Feeling tired or having little energy" and "Trouble concentrating on

24

25

26      [6] Abdullah describes "vulvadynia" as "[p]ain around the opening of the vagina."  (Pl.'s
    Mot. for Judgment at 8, n.6.)  MetLife does not dispute this description.

27      [7] As described by Abdullah, "Norco is similar to Vicodin" and "contains hydrocodone,
28  a narcotic pain medication."  (Pl.'s Mot. for Judgment at 6, n.4.)  MetLife does not dispute
    this description.

things," and responded "very difficult" to the question "[H]ow difficult have these problems

made it for you to do your work, take care of things at home, or get along with other

people?"  (See AR 254-55.)  Abdullah told Dr. Chan "there is 'no way' she can perform in

any efficient manner at work."  (See AR 254.)   As diagnoses, Dr. Chan listed "depression,

major," "chronic pain syndrome," "fibromyalgia," and "connective tissue disorder."  (See AR

255.)  In Dr. Chan's opinion, Abdullah "ha[d] made a huge effort to try to get better."  (See

AR 256.)

**III.    MetLife's Review of Abdullah's Disability Claim**

On May 8, 2007, Abdullah filed her disability claim with MetLife.  (See AR 0156.)  In

January 2008, MetLife arranged to have Abdullah's house under surveillance to

"[d]etermine the claimant's daily activities and employment status."  (See AR 0808.)  On

January 9 and 10, 2007, MetLife's investigator waited outside of Abdullah's residence and

never saw her leave.  (See id.)

Thereafter, MetLife asked Tracey Schmidt, M.D. ("Dr. Schmidt"), a board certified

internist and rheumatologist, to provide an opinion as to Abdullah's disability claim.  In a

review dated February 1, 2008, Dr. Schmidt summarized Dr. Karlin's medical records

pertaining to Abdullah's bunionectomy, Dr. Chan's notes from a November 13, 2009 visit,

the surveillance report, and Abdullah's "personal profile."  (See AR 0799-0801.)  Dr.

Schmidt noted, however, that "[t]he file lack[ed] any office notes from Dr. Chan, x-rays,

emergency room visits or physical therapy notes."  (AR 0800.)  On February 1, 2008, Dr.

Schmidt attempted to call Dr. Chan.  (See AR 0799.)  On February 4, 2008, Dr. Chan's

office left a voice mail message stating the additional information had been mailed and that

Dr. Schmidt should be receiving it shortly.  (See id.)  Dr. Schmidt makes no reference to

and apparently did not have the reports from Drs. Li, Abeles, Foster, and Schuchard, or

physician assistant McLean.  Based on what had been provided up to that point, Dr.

Schmidt concluded that "the file lack[ed] sufficient medical to comment on [Abdullah's]

functional capabilities from 8/6/07 onward."  (Id.)

In a letter dated February 29, 2008, MetLife denied Abdullah's claim, for the stated

reason that the "claim [did] not meet the criteria for benefits as set forth in the AccentCare

Long Term Disability Plan."  (See AR 0790.)  MetLife further explained that Abdullah's

"medical information d[id] not support a severity of impairment that would prevent [her] from

performing the essential duties of [her] medium occupation as a nurse from [the] date last

worked to present."  (See AR 0791.)

Also in said letter, MetLife informed Abdullah of her right to appeal the denial, and

suggested she provide the following information:

- physical exam findings that would indicate a severity of impairments
- up to date diagnostic test results with positive findings that would indicate a severity of impairments
- current restrictions and limitations that would preclude [her] from performing [her] job from 5/7/07 to present
- diagnosis and treatment plan with a return to work date[.]

(AR 0791-0792.)  On April 16, 2008, Abdullah filed her appeal.  (See AR 0431.)  In support

thereof, Abdullah supplied MetLife with additional medical records, that had not been

included with her original claim.  (See AR 0431-32.)

In connection with the appeal, Dr. Chan, on May 28, 2008, sent a letter to MetLife.

In his letter, Dr. Chan stated Abdullah had "[p]ains of neck, back, hands, and headaches

that are worsened with prolonged sitting, standing, lifting, writing, computer use (with

mouse and typing) as well as reading," and also "[d]aily weakness of arms, hands with

lifting, repetitive activities like typing or hold[ing] a phone."  (AR 0392.)  Dr. Chan also

reported Abdullah's symptoms of "[r]ecurrent dizziness with bending over, squatting, and

head movements up, down, left or right" and "[m]emory loss and decreased concentration

that occurs daily."  (Id.)  Dr. Chan concluded:  "As a result of her underlying diagnoses and

the symptoms, in my medical professional opinion, Ms. Abdullah is incapable of performing

her job/position in a reasonably continuous basis . . . . despite our efforts and Ms.

Abdullah's efforts to manage/treat her conditions."  (Id.)

MetLife thereafter asked Robert Kantor, M.D. ("Dr. Kantor"), an internist board

certified in occupational medicine, to assess Abdullah's appeal.  In a report dated June 19,

2008, Dr. Kantor provided his opinion that "[t]here still [was] little by way of clinical findings

1   to support impairment due to physical problems." (AR 0355.)  He concluded that "the

2   further documentation [did] not support an impairment or functional limitation due to

3   physical conditions from May 7, 2007 to the present and beyond." (AR 0356.)  In Dr.

4   Kantor's opinion, whether Abdullah has fibromyalgia is "to a large degree . . . irrelevant,"

5   because "fibromyalgia is not necessarily an impairing condition." (See id.)  Dr. Kantor

6   further opined that "any impairment would be due to psychological conditions, not physical,"

7   but added that he would "defer to the appropriate specialty as these conditions are outside

8   of [his] area of expertise as an internist and preventive medicine specialist." (Id.)

9

10      Subsequent to MetLife's receipt of Dr. Kantor's report, a notation in MetLife's records

11   indicates that Abdullah's medical records from Kaiser Permanente contained "no ongoing

12   progress notes during the time period in question[ ] that demonstrate[d] any functional

13   restrictions or limitations" based on a psychological condition. (See AR 116.)

14      On July 18, 2008, Dr. Li responded by letter to Dr. Kantor's report.  In her letter, Dr.

15   Li stated that at her initial consultation with Abdullah in March 2006, she "concurred with Dr.

16   Foster's assessment" and that her own "impression at the time was Undifferentiated

17   Connective disorder, Fibromyalgia, Sjorgens, and active arthritis." (See AR 0322.)  Further,

18   in Dr. Li's opinion, "trauma like motor vehicle accidents and surgery could exacerbate auto-

19   immune disease, arthritis, and fibromyalgia symptoms and chronic pain syndrome flares."

20   (See id.)

21      In her letter, Dr. Li emphasized and reaffirmed her diagnosis of fibromyalgia,

22   explaining Abdullah "reports classic FMS [fibromyalgia] symptoms" (see AR 0324); in

23   addition, Dr. Li responded in detail to Dr. Kantor's questioning a fibromyalgia diagnosis (see

24   AR 0323-24).  In particular, whereas Dr. Kantor opined that "there is insufficient evidence

25   on file to make a definitive diagnosis of fibromyalgia at all, as the claimant was not tender in

26   enough of the diagnostic points" (see AR 323), in Dr. Li's opinion, not having a "specified

27   number" of tender points on any one given day does not preclude a diagnosis of

28   fibromyalgia because "the following week [the patient] could have pain in all 18 tender

point areas (see id.).  Dr. Li also noted that three physical therapists had observed

Abdullah's "decreased Range of Motion and diminished reflexes" (see id.) and that

additional objective findings were made based on x-rays reflecting "skeletal changes [that]

are abnormal for a patient of [Abdullah's] age" (see AR 0324).  Dr. Li further noted that

along with "widespread pain and tenderness," patients with fibromyalgia "typically exhibit

other symptoms such as fatigue, poor sleep, headaches, anxiety, and depression." (See

AR 323.)  After considering Abdullah's anxiety and depression, which, in Dr. Li's opinion,

"are likely secondary to the [fibromyalgia], and are functionally limiting on their own," and

Abdullah's reports of "daily pain of a 6-8 on a 1-10 scale" (AR 324), Dr. Li concluded

Abdullah "is incapable of performing her job with the pain, anxiety, and depression and

other symptoms she's been managing up until this point, due to[fibromyalgia] symptom

overlay" (AR 0325).

     After receiving Dr. Li's response, MetLife attempted to have Dr. Kantor review her

letter to determine whether it would change his opinion (see AR 0122), but was informed

Dr. Kantor was "no longer w[ith] [the] vendor"[8] and thus not available to evaluate Dr. Li's

response (see AR 0123).  Dayton Payne, M.D. ("Dr. Payne"), a board certified internist and

rheumatologist, was then asked perform an independent review of Abdullah's claim. (See

AR 0168.)

     After reviewing Abdullah's medical records, Dr. Payne, in a report dated August 21,

2008, concluded that "[f]rom a rheumatology/internal medicine viewpoint, no restrictions or

limitations are supported."  (See AR 0170.)  Although Dr. Payne noted that the records he

reviewed "document the presence of multiple symptoms including diffuse and widespread

pain with stiffness and multiple nonspecific somatic symptoms including diffuse cognitive

disturbances, dizziness, in association with chronic headaches" (AR 0168), Dr. Payne

found "[t]here is no evidence of any objective data supporting the presence of any systemic

rheumatic condition that would be producing restrictions or limitations on activities" (AR

_____

     [8] MetLife states it "does not contract with physicians but with vendors, . . . who in
turn contract with physicians."  (See Def.'s Reply at 9, n.11.)

11

0171), nor did he "see findings of any cardiac, pulmonary, gastrointestinal, or neurological disease process that would be expected to be producing restrictions or limitations on activities" (id.).  Consequently, Dr. Payne concluded, "the claimant would be expected to be capable of unrestricted work."  (Id.)

After receiving Dr. Payne's report, MetLife, on September 8, 2008, sent Abdullah a letter notifying her of its denial of her appeal.  As explained therein: "The consultant [Dr. Payne] advised that from a thorough review of the clinical medical records provided including the historical information, workup data, examination findings, treatment data, clinical course information, and information gained through the telephone conference with Dr. Li[ ], there exist no restrictions or limitations that would preclude working at your own occupation."  (AR 0157.)

## LEGAL STANDARD

The standard of review applicable to a plan administrator's denial of ERISA benefits is dependent upon the terms of the benefit plan.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," an abuse of discretion standard is applied; otherwise, the denial is reviewed de novo.  Id.  Here, after considering the parties' respective written submissions as to the applicable standard, and following a hearing of the matter, the Court, on August 27, 2010, held the applicable standard of review is abuse of discretion.  (See Order filed August 27, 2010.)[9]  Such determination does not, however, end the discussion as to the legal standard.

"[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether

[9]The Plan expressly provides:  "The Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious."  (AR 0061.)   To the extent, Abdullah, in her reply, has endeavored to reargue the standard of review, the Court is unpersuaded and its determination of the issue remains unchanged.

1   there is an abuse of discretion."  Firestone, 489 U.S. at 115 (internal quotation and citation

2   omitted).  An  "inherent conflict" of interest exists where, as here, "a plan administrator both

3   administers the plan and funds it."  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 967

4   (9th Cir. 2006).  An inherent, or "structural" conflict, "should prove more important (perhaps

5   of great importance) where circumstances suggest a higher likelihood that it affected the

6   benefits decision, including, but not limited to, cases where an insurance company

7   administrator has a history of biased claims administration," and "should prove less

8   important (perhaps to the vanishing point) where the administrator has taken active steps to

9   reduce potential bias and to promote accuracy, for example, by walling off claims

10  administrators from those interested in firm finances, or by imposing management checks

11  that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."

12  Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008).  As the Ninth Circuit

13  observed in Abatie:

> The level of skepticism with which a court views a conflicted
> administrator's decision may be low if a structural conflict of interest is
> unaccompanied, for example, by any evidence of malice, of self-dealing,
> or of a parsimonious claims-granting history.  A court may weigh a conflict
> more heavily if, for example, the administrator provides inconsistent
> reasons for denial; fails adequately to investigate a claim or ask the
> plaintiff for necessary evidence; fails to credit a claimant's reliable
> evidence; or has repeatedly denied benefits to deserving participants by
> interpreting plan terms incorrectly or by making decisions against the
> weight of evidence in the record.

Abatie, 458 F.3d at 968-69 (internal citations omitted).

        Here, Abdullah contends the Court should apply a high level of skepticism to its

decision, based on factors in addition to the above-referenced structural conflict.  In

particular, Abdullah first contends MetLife violated a number of regulations adopted in

connection with benefit plans covered by ERISA.  In that regard, Abdullah cites to 29 C.F.R.

§ 2560.503-1(b)(5),[10] which, according to Abdullah, "requires MetLife to have

_____

        [10] 29 C.F.R. § 2560.503-1(b)(5) provides in relevant part: "Every employee benefit
plan shall establish and maintain reasonable procedures governing the filing of benefit
claims, notification of benefit determinations, and appeal of adverse benefit determinations
(hereinafter collectively referred to as claims procedures)." See id.

administrative procedures designed to ensure compliance with the provisions of the Plan,

and to ensure that similarly situated claimants are treated alike" (see Pl.'s Mot. for

Judgment at 2:16-18); further, in connection therewith, Abdullah cites to 29 C.F.R. §

2560.503-1(h)(iii)[11] and (m)(8)[12], which, according to Abdullah, "require those procedures to

be produced to the claimant during the administrative process (see id. 2:18-20.  Abdullah

asserts that "none appear in the administrative record, and none were provided in

discovery" and, as a result, the Court should find MetLife's decision "simply *ad hoc*" (see id.

at 2:20-23).

As MetLife points out, however, the above-referenced regulations set forth

requirements for a "plan," and are not applicable to third-party claims administrators such

as MetLife.  See, e.g., Lee v. Kaiser Found. Health Plan Long Term Disability Plan, 812 F.

Supp. 2d 1027, 1037 (N.D. Cal. 2011) ("The Court agrees with MetLife's understanding of

29 C.F.R. § 2560.503-1(b)(5), which is clearly directed at '[e]very employee benefit plan.'").

Further, as MetLife notes, Abdullah does not contend MetLife failed to comply with any of

the above-referenced procedures the Plan was required to adopt.

Abdullah next argues MetLife violated 29 C.F.R.2560.503-1(g)(1)(iii), by not

adequately specifying what evidence she needed to provide to perfect her appeal.

Pursuant to 29 C.F.R. § 2560.503(g)(1)(iii), "the plan administrator," in its notification of an

---

[11] 29 C.F.R. § 2560.503-1(h)(2)(iii) provides in relevant part: "[T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures . . . [p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.  Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8)[.]"  See id.

[12] 29 C.F.R. § 2560.503-1(m)(8) provides in relevant part: "A document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information . . . (i) [w]as relied upon in making the benefit determination; (ii) [w]as submitted, considered, or generated in the course of making the benefit determination . . .; (iii) [d]emonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) . . .; or (iv) [i]n the case of . . . a plan providing disability benefits, constitutes a statement of policy . . . concerning the denied . . . benefit for the claimant's diagnosis[.]"  See id.

adverse benefit determination, must "set forth, in a manner calculated to be understood by

the claimant . . . [a] description of any additional material or information necessary for the

claimant to perfect the claim and an explanation of why such material or information is

necessary[.]" See id.  ERISA regulations have been interpreted as requiring "a meaningful

dialogue between ERISA plan administrators and their beneficiaries."  Booton v. Lockheed

Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997).

        Here, as noted, MetLife, in its initial denial letter, informed Abdullah that, on appeal,

she "would need to submit for further consideration of [her] claim":

- physical exam findings that would indicate a severity of impairments
- up to date diagnostic test results with positive findings that would indicate a severity of impairments
- current restrictions and limitations that would preclude [Abdullah] from performing [her] job from 5/7/07 to present
- diagnosis and treatment plan with a return to work date

(AR 0791-92.)  In that letter, MetLife also informed Abdullah that although Dr. Karlin noted

he had treated her since May 2007, and although her medical records indicated she was

"involved in serious car accidents," there was nothing in any of those medical records

indicating an impairment severe enough to support a disability until her bilateral

bunionectomy in July 2007; MetLife further informed Abdullah that Dr. Schmidt had

"attempted to contact [her] healthcare provider on several occasions but was unsuccessful."

(See AR 0790-0791.)

        Citing Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863 (9th Cir.

2008), Abdullah argues MetLife's letter was not sufficiently informative.  The notification

letter at issue in Saffon, however, was considerably less informative than the letter here.  In

Saffon, the letter merely stated, "'[t]he medical information provided no longer provides

evidence of disability that would prevent you from performing your job or occupation,'" and

informed the claimant she could appeal by providing "'objective medical information to

support [her] inability to perform the duties of [her] occupation,'" but did "not explain why the

information [the claimant] ha[d] already provided [was] insufficient for that purpose").  See

id. at 870.

1    Again citing Saffon, Abdullah also argues MetLife failed to notify her directly of Dr.

2    Schmidt's inability to communicate with Dr. Chan.  See id. at 873 & n.4 (finding lack of

3    "meaningful dialogue"; noting, inter alia, "[i]f a claims administrator communicates with a

4    doctor who has treated a beneficiary, it must disclose that fact to the patient at a

5    meaningful time").  As MetLife points out, however, Dr. Chan's own records show Abdullah

6    had been notified by MetLife, no later than February 24, 2008, that Dr. Chan needed to

7    respond to Dr. Schmidt.  (See AR 0568 (email dated February 24, 2008, from Abdullah to

8    Dr. Chan, stating:  "Dr. Schmidt of Metlife needs to speak with you regarding my LTD claim

9    . . . . They claim this is the Last step B4 I get the final approval.").)  Moreover, before

10   MetLife's denial of Abdullah's appeal, both Dr. Chan and Dr. Li responded in detail to the

11   questions raised by MetLife's reviewing physicians.  (See AR 0322-25, 0392.)

12       Lastly, Abdullah contends MetLife's decision to retain Dr. Payne in place of Dr.

13   Kantor constitutes evidence of "doctor shopping."  (See Pl.'s Mot. at 18:12-14.)  On the

14   record presented, however, there is no evidence to support a finding that MetLife's decision

15   to retain Dr. Payne was based on anything other than Dr. Kantor's above-described

16   unavailability.

17       In sum, although MetLife's initial notification letter cannot be considered exemplary,

18   that communication, when considered in the context of the other forms of communication

19   between MetLife and Abdullah, does not demonstrate a failure to engage in a meaningful

20   dialogue, and none of the other factors suggesting application of an enhanced level of

21   skepticism, see, e.g., Abatie, 458 F.3d 968-69, have been shown.

22       Accordingly, the Court will apply an abuse of discretion review tempered by a

23   modest degree of skepticism.

24                                    **DISCUSSION**

25       **A.  Reasonableness of Denial**

26       In determining whether MetLife abused its discretion, the Court considers whether

27   MetLife's denial of Abdullah's claim was "(1) illogical, (2) implausible, or (3) without support

28   in inferences that may be drawn from the facts in the record."  Salomaa v. Honda Long

16

1   Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011) (internal quotation and citation

2   omitted).

3         As noted, MetLife initially denied Abdullah's claim for the stated reason that the

4   "medical information" it had received up to that date did "not support a severity of

5   impairment that would prevent [her] from performing the essential duties of [her] . . .

6   occupation as a nurse" (AR 0791), and, thereafter, based on its review of "[her] entire file,"

7   reaffirmed that finding in denying her appeal, stating "there is insufficient clinical medical

8   evidence to support the need for any functional restrictions or limitations" (AR 0158).

9         MetLife classified Abdullah's occupation as a registered nurse as a position with

10  "medium physical demands."  (See AR 0156.)  As set forth in the "position summary," an

11  individual holding such position is "[r]esponsible for managing the care plans of the

12  patients from admission through discharge and for maintaining the delivery of quality

13  patient care" and must have "sufficient endurance to perform tasks over long periods of

14  work hours" and the "[a]bility to travel to all business locations."  (AR 0440.)  Additionally,

15  the position "frequently" requires "close eye work (computers, typing, reading, writing)," as

16  well as "continuous sitting," and "standing, walking, [and] lifting [less than] 15 pounds" (AR

17  0441), and also "occasionally" requires "moderately heavy work (lifting, moving, loading

18  31-50 pounds) and "heavy/hard work (above average strength and stamina, lifting [more

19  than] 51 pounds, . . .)" (id.).

20        As discussed above, the medical records and letters from Abdullah's treating

21  physicians document multiple diagnoses of fibromyalgia and her longstanding complaints

22  of symptoms whose ultimate severity would preclude her from meeting the demands of her

23  occupation.  (See, e.g., AR 0324 (Dr. Li's July 18, 2008 letter describing Abdullah's reports

24  of "[c]hronic [f]atigue," "brain fog," and "daily pain of 6-8 on a 1-10 scale"); id. 0392 (Dr.

25  Chan's May 28, 2008 letter describing Abdullah's "[p]ains of neck, back, hands, and

26  headaches that are worsened with prolonged sitting, standing, lifting, writing, computer use

27  (with mouse and typing) as well as reading").)  Indeed, in his independent review for

28  MetLife, Dr. Payne acknowledged Abdullah's medical records "document the presence of

1   multiple symptoms," including "diffuse and widespread pain with stiffness," and "diffuse

2   cognitive disturbances, dizziness, in association with chronic headaches."  (See AR 0168.)

3   Needless to say, but nonetheless as Dr. Li pointed out in her letter to MetLife, "[a] job as a

4   Registered Nurse requires mental alertness[;] temporary and intermittent confusion could

5   result in a life-threatening situation."  (AR 0324.)

6          Although Dr. Kantor, in his report to MetLife, questioned whether Abdullah in fact

7   has fibromyalgia, Dr. Kantor never himself examined Abdullah and, more significantly, the

8   real issue, in his opinion, was not what caused Abdullah's symptoms but, rather, whether

9   those symptoms impaired her ability to function as a nurse.  (See AR 356.)  Although both

10  Dr. Kantor and Dr. Payne were of the opinion that Abdullah's medical records lacked

11  sufficient evidence of a disabling impairment, both such opinions were predicated on what

12  Dr. Payne characterized as a lack of "objective data."  (See AR 0171.)

13         As the Ninth Circuit has recognized, however, "fibromyalgia's cause or causes are

14  unknown, there is no cure, and, of greatest importance to disability law, its symptoms are

15  entirely subjective."  See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370

16  F.3d 869, 872 (9th Cir. 2004) (footnote omitted), overruled in part on other grounds by

17  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006).  "The symptoms of

18  fibromyalgia consist of the patient's reports of pain and nothing else."  Jordan, 370 F.3d  at

19  877.  Further, "individual reactions to pain are subjective and not easily determined by

20  reference to objective measurements."  Saffon v. Wells Fargo & Co. Long Term Disability

21  Plan, 522 F.3d 863, 872 (9th Cir. 2008).

22         By requiring objective evidence of functional impairment, MetLife essentially

23  discounted in their entirety Abdullah's reports of pain and cognitive symptoms as well as

24  both her own and her treating physicians' assessments of how those symptoms interfered

25  with her ability to function as a registered nurse.  MetLife had no evidence before it,

26  however, suggesting Abdullah was anything but credible in describing her symptoms.  As

27  noted, the surveillance performed at MetLife's request produced nothing to contradict

28  Abdullah's reported symptoms, and although MetLife could have required Abdullah to

18

1   submit to an independent medical examination or functional capacity evaluation, MetLife

2   did not elect to do so (see AR 0151), let alone obtain any information therefrom

3   inconsistent with Abdullah's complaints.

4       Given the absence of any evidence to even raise a question as to Abdullah's

5   credibility, and by demanding "'objective' evidence for a disease that eludes such

6   measurement," see Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004),

7   MetLife established what amounted to "a threshold that can never be met by claimants

8   who suffer from fibromyalgia or similar syndromes, no matter how disabling the pain," see

9   Minton v. Deloitte & Touche USA LLP Plan, 631 F. Supp. 2d 1213, 1219 (N.D. Cal. 2009).

10      Under such circumstances, MetLife's denial of Abdullah's claim for disability

11  benefits was a determination "without support in inferences that may be drawn from the

12  facts in the record," see Salomaa, 642 F.3d at 676, and, as such, constituted an abuse of

13  discretion.

14      **B. Relief Claimed**

15      Abdullah argues she is entitled to an award of back benefits in the amount of

16  $25,111, together with prejudgment interest at 10%, and attorney's fees.  Abdullah

17  concedes the Administrative Record is "incomplete" as it does not contain Abdullah's

18  application for coverage or her pre-disability earnings (see id. at 23:23-27), but argues the

19  relevant documentation is available and that the amount of benefits is subject to

20  calculation at this time.  MetLife disputes Abdullah's calculation of benefits and argues

21  Abdullah's claim, if Abdullah were to prevail on the merits, should be remanded to MetLife

22  for a determination of benefits.  MetLife also argues the request for interest is premature

23  and disputes the rate of interest claimed.

24      **1. Award of Benefits**

25      "[A] plan administrator will not get a second bite at the apple when its first decision

26  was simply contrary to the facts." Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d

27  1154, 1164 (9th Cir. 2001) (affirming district court's award of benefits and denial of request

28  to remand for determination thereof where disability insurer abused discretion by

1   terminating benefits); see also Silver v. Executive Car Leasing Long-Term Disability Plan,

2   466 F.3d 727, 736 (9th Cir. 2006) (reversing district court's finding in favor of plan and

3   remanding "for the district court to calculate an award of benefits"); (cf. Saffle v. Sierra

4   Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455 (9th Cir.

5   1996) (remanding for determination on merits where plan administrator "ha[d] not yet had

6   the opportunity of applying the [p]lan, properly construed"; distinguishing cases where plan

7   administrator abuses discretion by "relying on clearly erroneous finds of fact").

8        Accordingly, the Court finds it appropriate to award benefits directly rather than to

9   remand the matter to MetLife for that determination.  Further, because MetLife raises a

10  number of factual issues underlying the calculation of benefits, the Court will direct the

11  parties to meet and confer with respect to that calculation in an effort to arrive at the

12  appropriate figure without an evidentiary hearing.

13                        **2.  Prejudgment Interest**

14       Whether prejudgment interest should be awarded "is a question of fairness lying

15  within the court's sound discretion, to be answered by balancing the equities."  Shaw v.

16  International Ass'n of Machinists and Aerospace Workers, 750 F.2d 1458,146 (9th Cir.

17  1985) (internal quotation and citation omitted).  Here, given the lack of factual support for

18  MetLife's denial of benefits, Abdullah's limited resources, and no indication in the record

19  that such additional award would impose a financial strain on MetLife or otherwise work to

20  the detriment of other plan beneficiaries, see id. (discussing factors for consideration), the

21  Court will exercise its discretion to award plaintiff prejudgment interest on the benefits

22  awarded.

23       "[T]he interest rate prescribed for post-judgment interest under 28 U.S.C. § 1691 is

24  appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on

25  substantial evidence, that the equities of that particular case require a different rate."

26  Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384, 1391 (9th Cir. 1994)

27  (internal quotation and citation omitted).  In this instance, no such evidence has been

28  presented in support of Abdullah's request for an award at 10% rather than at the rate

1   prescribed by § 1691, nor does the record reflect an equitable reason for deviating from

2   the calculation ordinarily used.

3        Accordingly, prejudgment interest will be awarded at the rate prescribed by the

4   above-cited statute.

5                    **3.  Attorney's Fees**

6        "[A] district court considering a motion for attorney's fees under ERISA should apply

7   discretion consistent with the purposes of ERISA, those purposes being to protect

8   employee rights and to secure effective access to federal courts." Nelson, 37 F.3d at

9   1392.  "As a general rule, ERISA employee plaintiffs should be entitled to a reasonable

10  attorney's fee if they succeed on any significant issue in litigation which achieves some of

11  the benefit . . . sought." Id.  Here, the Court has found MetLife abused its discretion in

12  denying Abdullah's claim for benefits and that she is entitled to an award of benefits, and,

13  having considered the other factors relevant to such determination, see, Smith v. CMTA-

14  IAM Pension Trust, 746 F.2d 587, 590 (9th Cir. 1984), finds such factors weigh in favor of

15  an award of attorney's fees.

16       Accordingly, the Court will award Abdullah reasonable attorney's fees in an amount

17  to be determined according to proof made by motion filed pursuant to Rule 54 of the

18  Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 54(d)(2).

19                        **CONCLUSION**

20       For the reasons stated above, Abdullah's motion for judgment is hereby GRANTED

21  and MetLife's cross-motion for judgment is hereby DENIED.

22       The Court finds Abdullah became disabled as of May 7, 2007, and, consequently, is

23  entitled to disability benefits under the Plan, beginning at the end of the elimination period

24  and continuing until such time as Abdullah fails to meet the definition of "Disabled" under

25  the Plan.

26       The parties are DIRECTED to meet and confer, no later than October 19, 2012, for

27  the purpose of calculating the amount of benefits currently due Abdullah.  The parties are

28  further DIRECTED to jointly submit, no later than November 2, 2012, a proposed

judgment,[13] inclusive of prejudgment interest and attorney's fees, or, in the event they are unable to agree on the amount or form of judgment, to submit a joint statement setting forth therein each parties' proposed judgment and the reasons for any differences.

**IT IS SO ORDERED.**

Dated: September 19, 2012

MAXINE M. CHESNEY
United States District Judge

_____

[13] Such joint submission is in no manner to be deemed a waiver of any argument MetLife may choose to make, in this court or any other court, as to the Court's resolution of Abdullah's claims.